## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RODERICK FOXWORTH, JR.       :      CIVIL ACTION
                                   :

          v.                      :
                                   :

PENNSYLVANIA STATE POLICE, et al.   :      NO. 03-CV-6795

## MEMORANDUM

**Baylson, J.**                                      **November 29, 2005**

### I.     Introduction

      Plaintiff Roderick Foxworth, Jr. ("Plaintiff" or "Foxworth") brings this action alleging employment discrimination based on race against the Pennsylvania State Police ("PSP"), Jeffrey Miller, Terry McElheny, Steven McDaniel, and Linda M. Bonney (collectively, "Defendants") pursuant to 42 U.S.C. §§ 1981 and 1983, as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").   Presently before this Court is Defendants' Motion for Summary Judgment, pursuant to F.R. Civ. P. 56.  For the reasons set forth below, the Defendants' Motion is granted on all claims.

### II.     Background

####      A.     Procedural Background

      Plaintiff filed his original employment discrimination and civil rights Complaint on December 19, 2003.  On January 19, 2005, he filed an Amended Complaint.[1]  On April 11, 2005, this court issued a memorandum and order granting in part and denying in part Defendants' motion

---

       [1]Plaintiff's case was in suspense for approximately six months pending the exhaustion of Plaintiff's claims before the EEOC.  The case was transferred back to the current docket on January 11, 2005.

to dismiss the Amended Complaint.[2]   Thereafter, on April 21, 2005, Plaintiff filed his "Third [sic]

Amended Complaint,"[3] which states Title VII, due process and equal protection claims.  Defendants

filed this Motion for Summary Judgment (Doc. No. 48) on August 15, 2005.  Briefing in this matter

was complete on September 16, 2005.  Oral argument was held on November 22, 2005.

        **B.        Factual Background**

        Plaintiff is a former applicant to the position of Pennsylvania State Police cadet.  Defendant

Jeffrey Miller ("Miller") is the Commissioner of the PSP, a position he has held since January 21,

2003.  He was the acting Commissioner at the time of the Plaintiff's application to the PSP.

Defendant Terry McElheny ("McElheny"), now retired, was a trooper with the PSP for

approximately thirty-four years, and served as the coordinator of the polygraph screening process

utilized by the PSP for trooper cadet applicants.  Defendant Steven O. McDaniel ("McDaniel"), now

a Captain and Commander of Troop J in Lancaster and Chester Counties, was a Lieutenant and

Supervisor of the Recruitment Section of the PSP Bureau of Human Resources at the time of the

events at issue.  Finally, Defendant Linda M. Bonney ("Bonney") is the Director of Human

Resources for the Pennsylvania State Police, a position she has held since 1998.  (Def.'s Mot.

Summ. J. at ¶¶3-8; Pl.'s Resp. to Summ. J. at ¶¶3-8).

------

[2]Pursuant to that order, this Court decided that the § 1981 (Count III) claim would be
treated as merged into Plaintiff's § 1983 (Count I) claim.  Moreover, we dismissed Count I as
against (1) the PSP, (2) the individual Defendants Miller, McElheny, McDaniel, and Bonney in
their official capacities and (3) Defendant Miller (with leave to amend) in his personal capacity
and dismissed Count II against all the individual defendants.  Foxworth v. Pa. State Police, No.
03-6795, 2005 WL 840374 (E.D. Pa. Apr. 11, 2005).  Plaintiff has since amended to re-assert his
claims against Miller in his individual capacity.

[3]Although this is Plaintiff's third complaint overall, in fact, it is only his second *amended*
complaint. With this latest complaint, Plaintiff re-asserts Count I and III against Defendant Miller
in his personal capacity.

      Plaintiff is a twenty-six year-old African-American male who applied to be a cadet for the PSP.  In April 2003, when he twenty-three years old, Plaintiff submitted an application for employment to the PSP.  Plaintiff took and passed the required written and oral examinations, scoring well on both.  Thereafter, the PSP ran a criminal history check on Plaintiff.  After the record check came back negative, and because of his examination scores, Plaintiff received a letter from the PSP's Bureau of Human Resources on April 25, 2003 extending him a "conditional offer" of employment.  This same letter informed Plaintiff that he had to successfully complete the remaining Cadet selection procedures to receive a bona fide offer, but that he was to report to the PSP academy on May 15, 2003 for further processing.  Plaintiff was instructed to complete and bring with him a "Processing Packet." (Def.'s Mot. Summ. J. at ¶¶40-49, 46; Pltf.'s Memo. at ¶¶40-49).

      In his application form, Plaintiff candidly included detailed information about a theft he had committed in 1998 when he was eighteen years old. Id. at ¶50.  At that time, Plaintiff was working as a shift supervisor at a Boston Market restaurant.  Plaintiff and a co-worker faked a theft, took cash and made a false police report, indicating to the police that the restaurant had been robbed.  In fact, the two kept the money ($4,000, which they split).  Soon thereafter, after being summoned by police for further questioning, Plaintiff told the truth about the theft and his role in it.  He was arrested and charged with a variety of offenses, pursuant to which Plaintiff applied for and was granted Accelerated Rehabilitative Disposition ("ARD"). Id. at ¶9-18.

      ARD is a program for first time offenders, whereby if a defendant successfully completes a probationary period, the charges are dismissed and the criminal record is expunged.  Pa. R. Crim. P. 300 et seq.; Gilles v. Davis, 427 F.3d 197, 209 (3d Cir. 2005); Junod v. Bader, 458 A.2d 251, 253-54 (Pa. Super. Ct. 1983).  Its purpose is both to rehabilitate offenders and to foster judicial

3

economy by promptly disposing of minor criminal charges. Gilles, 427 F.3d at 209.  Expungements

are governed by the Criminal History Information Act ("CHRIA"), 18 Pa. Cons. Stat. § 9101, et seq.

Pursuant to the CHRIA, the PSP is the "Central Repository," responsible for maintaining criminal

records.  18 Pa. Cons. Stat. § 1902.  When the Expungement Unit of the PSP receives an ARD order

to expunge, that individual's criminal record is taken "off line," meaning no record will appear if

anyone runs a criminal record check on the person.  However, the Repository maintains a list of

persons whose convictions have been expunged pursuant to ARD, in case prosecutors in the future

need to decide if an individual is eligible to receive ARD again.[4]  On July 6, 2001, after Plaintiff

complied with the ARD requirements, the Montgomery County Court of Common Pleas granted his

petition to expunge his criminal record.  His attorney then forwarded copies of the expungement

order to the PSP and to other agencies.  Because the above procedures were followed and the

offense was expunged, when PSP's Bureau of Human Resources ran Plaintiff's record in 2003, it

found he had no criminal history.  (Def.'s Mot. Summ. J. at ¶¶20-29, 46; Pl.'s Resp. to Summ. J. at

¶¶20-29, 46).

When Plaintiff arrived at the academy on May 15, 2003, he submitted his application packet

and completed an additional "Polygraph Screening Booklet," in which he also included information

about the Boston Market theft.  This booklet included information about certain automatic

disqualification factors.  After being advised to do so by Rose Polek,[5] Defendant McElheny took

Plaintiff aside and informed him that, because of his admitted criminal behavior, he was subject to

---

[4]While Plaintiff does not dispute that the PSP keeps such a list, he asserts that the PSP
lacks authority to do this pursuant to the CHRIA. (Pl.'s Resp. to Summ. J. at ¶25).

[5]Ms. Polek is the Director of the Employment Services and Systems Division of the
Bureau of Human Resources and was at the time in question. Id. at ¶7.

4

disqualification.  (Def.'s Mot. Summ. J. at ¶¶56-61; Pl.'s Resp. to Summ. J. at ¶¶56-61).

Since 1997, the PSP has had in place "automatic disqualification factors" in connection with the hiring of police cadets.  If any one of these factors is found to be present at any stage of the application process, the applicant is automatically disqualified from further consideration.  At the time of Plaintiff's application to the PSP, a cadet applicant was subject to disqualification on the basis of "criminal behavior" if, among other things, he or she engaged in "criminal behavior, *regardless if arrested*, for admissions by the applicant that would be graded as a Misdemeanor-1 or higher."  (Def's Ex. E/Polek 5 - Automatic Disqualification Factors).  Plaintiff was told he would have to withdraw his application or other law enforcement agencies would find out and not hire him either.  Rather than risk this, Plaintiff withdrew his application.  However, Plaintiff protested, emphasizing his record had been expunged pursuant to ARD.  The same day, Plaintiff discussed his concerns with Defendant McDaniel, who reiterated that the automatic disqualification factors apply to admitted criminal behavior, regardless of whether the individual was arrested or convicted.  Plaintiff also later made a request to Defendant Bonney to review his case, but his request to appeal his disqualification was denied.  Id. at ¶¶51-67.  Furthermore, Plaintiff alleges Commissioner Miller implemented the policies and procedures at issue for the entire agency, including accepting and acquiescing in, the PSP's application of "a discriminatory and improper automatic disqualification" factor: admissions of expunged charges.  Id. at ¶¶24-27.  However, the automatic disqualification factors had been in place for several years before Miller took office and other than his role of setting and implementing policy and procedure, he does not participate in the individual cadet hiring decisions or in processing individual expungement orders.  Id. at ¶¶29, 39.

Plaintiff was one of 2,993 applicants who took the written Cadet examination in 2003 and

was one of 888 applicants on the Cadet Eligibility List after the oral portion of testing.  Of the applicants who were invited back after testing because no criminal histories were revealed, forty-three (not including Plaintiff) were disqualified or withdrew their applications because of criminal behavior.[6]  Of these, forty-one were white and two were black.  Additionally, in 2002-03 (1) other than Plaintiff, no other cadet applicant who had an ARD in the past was disqualified or withdrew their applications because of criminal behavior, and (2) no cadet applicant who *successfully* completed the selection process had an expunged ARD offense in their past.  Id. at ¶¶68-74.

Finally, it is relevant to note that, unrelated to Plaintiff's case, the PSP's hiring practices have in the past been challenged.  See Bolden v. Pa. State Police, 371 F. Supp. 1096 (E.D. Pa. 1974).  In the Bolden litigation, a class action commenced more than thirty years ago and alleging discrimination in employment and promotion policies against the PSP, a consent decree was entered which remained in effect for approximately twenty-five years.  In 1999, upon the joint motion of all parties, the consent decree was dissolved.  See Bolden v. Pa. State Police, No. 73-2604, 1999 WL 80289 (E.D. Pa. Feb. 1, 1999).  At that time, "the cadet hiring criteria, examination, scoring, and processing [was] accepted by the [federal district] Court."  Id. at *2.

### C.    Plaintiff's Claims

Count I of the Amended Complaint makes a claim against all the individual Defendants in their personal capacity pursuant to 42 U.S.C. § 1983, alleging they violated Plaintiff's civil rights.  Specifically, Plaintiff alleges that Defendants deprived Plaintiff of his federally protected rights under the Due Process Clause of the Fourteenth Amendment and Equal Protection of laws by improperly disqualifying Plaintiff from the cadet position and denying him a hearing in the matter.

_____

[6]Of the 43 persons, 24 were actual disqualifications; the other 19 applicants withdrew because they would have been disqualified under the automatic factors.  Id. at ¶71.

Third Amended Compl. at ¶¶36-63.  Plaintiff seeks at least $100,000 in compensatory and punitive damages.  Id. at 17.  Count III makes parallel race discrimination claims pursuant to 42 U.S.C. § 1981. Id. at ¶¶83-97.  However, in accordance with this court's April 11, 2005 Memorandum, Count III will be treated as "merged into [Plaintiff's] § 1983 claim." Foxworth, 2005 WL 840374 at *6.

Count II makes a claim pursuant to Title VII against the PSP only for employment discrimination on the basis of his race in regard to the cadet hiring process.  Third Amended Compl. at ¶¶64-82.  Plaintiff seeks equitable relief, compensatory damages in excess of $100,000, and reasonable attorney's fees.  Id. at 20-21.

**III.    Parties Contentions on Summary Judgment**

**A.    Defendants**

Noting that the same familiar burden-shifting framework applies to all his claims of employment race discrimination, whether under Title VII (Count II), § 1983 (Count I) or § 1981 (Count III), Defendants argue that Plaintiff's race discrimination claims fail as a matter of law. First, Defendants contend that Plaintiff can not even make out a *prima facie* case of race discrimination because (1) his past criminal behavior disqualified him for the position of cadet, and (2) the fact that whites and non-whites alike have been disqualified dispels any inference of discrimination.  Second, Defendants state they offer a legitimate non-discriminatory reason for Plaintiff's rejection: a stated policy to disqualify candidates with certain past criminal behavior. Third, Defendants argue that no fact-finder could find this reason pretextual given that the vast majority of disqualified applicants in 2003 were white. (Def.'s Mot. Summ. J. at 6-10).

Next, Defendants argue that Plaintiff can not show he was deprived of either due process or equal protection. Id. at 11-24.  First, under the rubric of substantive due process, Defendants argue

that settled Third Circuit caselaw holding that *tenured* public employees have no fundamental right in their employment bars Plaintiff, merely an *applicant*, from pursuing such a claim.  Moreover, Defendants urge that even if Plaintiff could assert the deprivation of a fundamental right, Plaintiff can not satisfy the test that the Defendants' conduct was shocking to the conscience.  Id. at 12-13.  Second, Defendants contend that Plaintiff's claim also fails as a matter of law if pursued under a procedural due process theory.  They argue that Plaintiff can not show a stigma to his reputation plus some concomitant infringement of a protected right or interest, as he would need to in order to sustain a claim based on the deprivation of a protected *liberty* interest in employment.  Also, they aver that given the "solid line of authority" stating that persons have no protected *property* interest in public employment, Plaintiff therefore cannot pursue a property theory.  Id. at 13-21.  Third, Defendants argue that Plaintiff can not establish that he was treated differently from any other *similarly situated* applicant, as he must to succeed on an equal protection claim.  Id. at 21-24.  Next, Defendants argue that there are no particular facts indicating that Defendant Clark had any personal involvement with Plaintiff's treatment, and thus he cannot be held liable on a *respondeat superior* basis.  Id. at 24-26.   Finally, Defendants assert that qualified immunity shields the individual Defendants from liability because the PSP's actions did not amount to a Constitutional violation and, even if it did, under the law as it existed in mid-2003, no reasonable PSP official would have understood implementing the disqualification factors to be improper.  Id. at 26-27.

### B.     Plaintiff

Plaintiff agrees that the McDonnell Douglas-Burdine-Hicks framework applies to all his race discrimination claims, including those articulated under Title VII, § 1983 and § 1981.  He urges, however, that he need not prove discriminatory motive because his case should be analyzed under a

disparate impact approach.  Further, he argues that Defendants' proffered reason for Plaintiff's rejection is pretextual because (1) in 1995, another white applicant was not disqualified despite having an "abysmal" background and (2) the impact of applying the factors is to disqualify higher percentages of minority applicants. (Pl.'s Resp. to Summ. J. at 5-13).

Regarding substantive due process, the Plaintiff concedes that he has no fundamental right to public employment, but still asserts the PSP's actions amount to "invidious discrimination" that have no rational basis.  Further, he argues Defendants' actions were shocking to the conscience. Id. at 40-43.  As to procedural due process pursuant to a property theory, Plaintiff counters that 18 Pa. Cons. Stat. 9124 gives rise a protected property right.  He argues that since the automatic disqualification procedures are in direct contravention to that statute, he properly states his procedural due process claim.  Pursuant to a liberty theory, Plaintiff contends that he need only state damage to his reputation, and the humiliation and diminished job prospects he suffered satisfies that burden.  Id. at 38-39.  Finally, responding to Defendants' contentions regarding equal protection, Plaintiff asserts that he may satisfy his burden by demonstrating that the PSP could have used alternate hiring practices that would have reduced the racially disparate impact.  Id. at 42-45. Additionally, Plaintiff states the Defendants are not entitled to qualified immunity because they were well aware at the time of Plaintiff's rejection that they were not permitted to consider expunged convictions.  Id. at 45-47.  Finally, Plaintiff contends that Commissioner Miller should be held liable, because he was mandated to oversee all the PSP's practices and procedures and because he tolerated past and ongoing wrongdoing. Id. at 48-49.

**IV.    Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

9

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id. "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. at 249.

## V.    Discussion

### A.    Race Discrimination Claims

It is unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a claim of disparate treatment, the plaintiff must demonstrate purposeful discrimination. Patterson v. McLean Credit Union, 109 S.Ct. 2363, 2377 (1989); Weldon v. Kraft, Inc., 896 F.2d 793, 796 (3d Cir. 1990).

Absent direct evidence, the plaintiff may prove intent through the familiar framework established in the McDonnell Douglas-Burdine-Hicks line of cases. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). In those cases, the Supreme Court set forth the shifting allocation of burdens, proof and persuasion in a Title VII case alleging disparate treatment in employment. However, subsequent caselaw has established that this same burden-shifting approach used in Title VII claims is also applied when analyzing employment discrimination claims brought under 42 U.S.C. § 1981 and racially based employment-related equal protection claims under 42 U.S.C. § 1983. See, e.g.,

10

Hicks, 509 U.S. at 506 n.1 (assuming Title VII burden-shifting framework applies to claim under §

1983); Patterson, 491 U.S. at 186 (applying framework to claims under 42 U.S.C. § 1981);

Morrissey v. Luzeme County Community Coll., 117 Fed. Appx. 809, 814 (3d Cir. 2004) (Title VII

and § 1983); Jones, 198 F.3d at 409 (Title VII and § 1981); Stewart v. Rutgers, the State Univ., 120

F.3d 426, 432 (3d Cir. 1997) (§ 1981 and § 1983).  Consequently, all of Foxworth's race

discrimination claims are to be analyzed using the same analysis.  Stewart, 120 F.3d at 432.

First, the Plaintiff must show by a preponderance of the evidence that a *prima facie* case of

unlawful discrimination exists. See Hicks, 509 U.S. at 505; Fuentes v. Perskie, 32 F.3d 759, 763 (3d

Cir.1994).  Second, once a plaintiff establishes a *prima facie* case, the employer must produce

evidence showing that a legitimate nondiscriminatory reason can account for its action. See Fuentes,

32 F.3d at 763. However, even if the employer produces such evidence, the plaintiff can still survive

a summary judgment motion if he produces "sufficient evidence to raise a genuine issue of fact as to

whether the employer's proffered reasons were not its true reasons for the challenged employment

action." Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 (3d Cir.1996).  See also

Hicks, 509 U.S. at 511.  Although the burden of production shifts throughout this process, the

ultimate burden of persuading the trier of fact always remains with the plaintiff. See Texas Dep't of

Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

          **1.      Burden One: Prima facie Case**

To establish a *prima facie* case, a plaintiff must initially introduce evidence showing that (1)

he is a member of a protected class, (2) he was qualified for the position at issue, (3) he suffered an

adverse employment action, and (4) that the circumstances surrounding the adverse action give rise

to an inference of unlawful discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

(1973). Plaintiff's burden at the *prima facie* stage is not meant to be onerous. <u>Burdine</u>, 450 U.S.

253; <u>Simpson v. Kay Jewelers, Inc.</u>, 142 F.3d 639, 646 (3d Cir. 1988).

      Defendants contend that Plaintiff can not make out a *prima facie* case of race discrimination

because (1) his past criminal behavior disqualified him for the position of cadet, and (2) the facts

that the cadet hiring criteria was expressly approved when the <u>Bolden</u> consent decree was dissolved

and that white candidates alike have been disqualified dispel any inference of discrimination. (Def.'s

Mot. Summ. J. at 6-7). Plaintiff relies on showing that an allegedly similarly-situated white cadet

applicant, a Michael Evans, was hired in 1995 notwithstanding the PSP's knowledge of his

"abysmal record of sexual and racial improprieties."[7] (Pl.'s Resp. to Summ. J. at 2, 7). Plaintiff

points to the PSP's "more favorable treatment" of Mr. Evans in order to create an inference of

unlawful discrimination.

      Plaintiff, as an African American, is a member of a protected class. Additionally, he applied

to but was not hired by the PSP. Therefore, Foxworth easily satisfies the first and third prongs of

the *prima facie* case. The second and fourth present more of a challenge. However, since the *prima*

*facie* stage is not meant to be onerous for Plaintiff, we are willing to assume *arguendo* that but for

the disqualification policy that Plaintiff is challenging, he was otherwise qualified for the position of

cadet. Notably, Plaintiff scored well on both the written and oral examinations, a fact admitted by

Defendants. Finally, we are also willing to entertain *arguendo*, for his *prima facie* showing,

Plaintiff's assertion that the PSP's hiring of a white cadet applicant with a questionable background

---

     [7] Michael Evans applied to the PSP to be a cadet in 1995. According to Plaintiff, the
PSP's background investigation of Evans revealed that he had been accused of having racial and
sexual improprieties and was dismissed from another sheriff's office. (Pl.'s Resp. to Summ. J. at
¶83-85). Once Evans became a trooper, he engaged in multiple acts of on-duty sexual
misconduct and was later sentenced to serve time in prison. <u>Haber v. Evans</u>, 268 F. Supp. 2d 507,
509 n.3 (E.D. Pa. 2003).

raises an inference of discrimination.  See Simpson, 142 F.3d at 646 (evidence of more favorable

treatment of a single member of a non-protected ground is acceptable grounds to give rise to

inference of discrimination at *prima facie* stage of analysis).

### a.        Disparate Impact

We must also address Plaintiff's contention in his summary judgment response that the court

may analyze his *prima facie* case under a disparate impact approach.  Under this theory, he asserts

that the facially neutral automatic disqualification procedures disproportionately impact African

Americans and therefore operate as the functional equivalent to intentional discrimination.  (Pl.'s

Resp. to Summ. J. at  8-11).  Defendants counter that Plaintiff's race discrimination claims were

plead as disparate treatment and that he has characterized them as such at his deposition, in the

majority of his summary judgment response and in his pretrial memorandum.  Therefore,

Defendants argue he can not now change his theory and, even if he did, the claim would fail. (Def.'s

Reply at 2-4).  Accordingly, we must first address whether Plaintiff sufficiently plead the theory of

disparate impact, such that we can even address the merits of whether he satisfies a *prima facie*

case.[8]

As a threshold matter, the Court notes that the thrust of Plaintiff's complaint, as well as his

other pleadings, briefs and even his deposition testimony are most fairly read as advancing a

disparate treatment claim.[9]  However, pointing to paragraphs 74-75 and 92-94 of his Third

_____

[8]In Josey v. John R. Hollingsworth Corp., 996 F.2d 632 (3d Cir. 1993), the Third Circuit
squarely held that a plaintiff may not raise a disparate impact claim for the first time after the
close of discovery.  Id. at 641-42.  Thus, if Plaintiff waited until summary judgement stage to
allege disparate impact, as Defendants argue, then Josey bars him from proceeding on this theory.

[9]No less than three separate times in his complaint, Plaintiff uses the words "disparate
treatment" and uses similar language multiple times suggesting the same.  See Third Amended
Compl. at  ¶¶62, 74, 76, 78, 82.  In paragraphs 90 and 92, Plaintiff averred Defendants' "conduct

Amended Complaint, Plaintiff argued in his petition for sur-reply and at oral argument that he

"clearly couches certain portions of his complaint as disparate impact." (Pl.'s Pet. for Sur-Reply at

2).  Regarding paragraphs 74-75,[10] we simply cannot agree.  In that in both these paragraphs

Plaintiff describe less favorable treatment *to himself* as compared to others because of his race, this

is actually language describing disparate treatment, not impact.[11]

Paragraphs 92-94 of Count III (§ 1981), while decidedly conflating disparate treatment and

disparate impact, present a closer call.  Plaintiff's complaint does assert that (1) the "hiring practices

. . . create a substantial under-representation of African-Americans, and a majority of white State

Policemen," Third Amended Compl. at ¶92, (2) "the automatic disqualification procedures . . . are

more *prone* to exclude African Americans," Id. at ¶93, and (3) that the "hiring practices . . .

establish a class of persons composed of African Americans . . . to whom equal opportunity . . . is

denied," Id. at ¶94, all of which could be read to advance disparate impact theory.  See Raytheon,

_____

was disparate because it was intentional" and was "designed to discriminate".  Moreover, at
Plaintiff's own deposition, he described the *only* basis for his contention that he was
discriminated against was that with regard to disqualification factors, he was *treated differently*
than Michael Evans, the white cadet applicant who had applied in 1995. (Def.'s Ex. A -
Foxworth Depo. at 109-10).  In his pretrial memorandum, Plaintiff also describes his Title VII
and § 1981 claims as "stem[ing] from disparate treatment." (Pl's Pretrial Memo. at 3).

[10]In paragraph 74, Plaintiff asserts that the disqualification factors were "enforced in a
disparate fashion against *this* African American cadet applicant" as compared to the screening
conducted on Michael Evans.  In paragraph 75, he uses the magic words "discriminatory impact"
once, but critically goes on to describe "discriminatory impact *upon the Plaintiff*." Third
Amended Compl. at ¶75-76 (emphasis added).  Although the Court did not formally grant
Plaintiff's motion to file a sur-reply brief (Doc. No. 61), his counsel made these arguments at oral
argument.

[11]In Raytheon Co. v. Hernandez, 540 U.S. at 44 (2003), the Supreme Court explained that
"[d]isparate treatment' is [where the] . . . employer simply treats some people less favorably than
others because of their race . . . or [other protected characteristic]," whereas disparate impact
involves an unintentional facially-neutral employment practice that in fact falls more harshly on
one group than another. Id. at 52.

540 U.S. at 52.  However, in those very same paragraphs, Plaintiff makes clear that he believes

Defendants' conduct was "designed to discriminate," Id. at ¶92, and these same factors are "not

being even-handedly applied to African-Americans," Id. at ¶93, language denoting purposeful

disparate treatment.  See Raytheon, 540 U.S. at 52.  Ultimately, it is difficult to discern which theory

he is advancing because Plaintiff uses language that somewhat randomly jumps between the two.  In

sum, Plaintiff pleads disparate impact very conjecturally, if at all.  However, construing the

complaint in the light most favorable to Plaintiff, we are willing to assume *arguendo* that Foxworth

sufficiently pleaded disparate impact theory in paragraphs 92-94 of Count III.

   Nonetheless, Plaintiff's disparate impact claim fails as a matter of law.  In order to prove a

*prima facie* case of disparate impact, Plaintiff must show a particular employment practice, which

cannot be justified by business necessity, has a disparate impact on a protected class.  Wards Cove

Packing Co. v. Atonio, 490 U.S. 642, 656-57 (1989); Josey, 996 F.2d 642.  Explaining this burden,

the Supreme Court in Watson v. Fort Worth Bank and Trust, 487 U.S. 977 (1988), stated:

> Plaintiff's burden in establishing a prima facie case goes beyond
> the need to show that there are statistical disparities in the
> employer's work force. The plaintiff must begin by identifying the
> specific employment practice that is challenged . . . [Then],
> causation must be proved; that is, the plaintiff must offer statistical
> evidence of a kind and degree sufficient to show that the practice in
> question has caused the exclusion of applicants for jobs or
> promotions because of their membership in a protected group. . .
> [Moreover], statistical disparities must be sufficiently substantial
> that they raise such an inference of causation.

Id. at 994-95.

   Here, Plaintiff asserts that the percentage of African-Americans in the PSP "is substantially

low" and that the incumbency statistics reveal a racial disparity.  (Pl.'s Resp. to Summ. J. at 9-10).

Specifically, at oral argument and in his briefs, Plaintiff pointed to three pieces of statistical

evidence to establish his prima facie case.  First is a "Workforce Analysis 2005 Summary," which

gives gender and race breakdowns by department within the PSP and according to Plaintiff shows

disproportionately low percentages of African-Americans among both civilians and troopers

working for the PSP (Pl.'s Ex. 7).  Second, an "Incumbency v. Estimated Availability 2005 PSP

Detail," allegedly "reveals an incumbency of percentage ratio of 6.94 in an availability percentage of

13.82" and therefore also "indicates . . . a disparity [in] African-American presence." (Pl.'s Ex. 6).

Finally, Plaintiff refers to deposition testimony by Defendant Linda Bonney, Director of Human

Resources, which suggests that the percentage of African-American cadet recruits has decreased

since the dissolution of the <u>Bolden</u> Consent Decree by approximately two to three percent from

about thirteen percent before the decree ended. (Pl.'s Ex. 5 at 29-30).

 In sum, all that Plaintiff's statistics show—read with Plaintiff's own inferences as he did not

develop his disparate impact theory during discovery—is a broad racial disparity, which according

to the controlling precedent in <u>Watson</u>, is not alone enough.  Also, the above cited data is equally

subject to other inferences.  There is no showing whatsoever that the employment practice

(disqualification factors) is responsible for that disparity as <u>Watson</u> requires.  Plaintiff's "Workforce

Analysis" merely provides summary racial breakdown statistics, seemingly for both police and

civilians, and does not break out information regarding cadets in particular.  It also provides no basis

to compare racial makeup from before to after the disqualification factors were in place, which

would be necessary to raise an inference that it was the factors in particular that caused the alleged

racial imbalance.  The incumbency statistics are similarly wanting for specificity, with no statistical

breakout for cadets[12] or a before/after comparison.  As such, it is also of no relevance to any analysis

---

 [12]At oral argument, Plaintiff argued that line 17 ("State Police R/F") was the same as a
breakdown for cadets, but this belies logic.  Even if "State Police" only includes uniformed

of the effect of the *disqualification factors* on *cadet* hiring.  Finally, Plaintiffs have also offered

nothing to link the slightly lower post-<u>Bolden</u> Consent Decree percentages of minority hires to the

application of the automatic disqualification factors in particular.  As the Third Circuit in

<u>N.A.A.C.P. v. City of Bayonne, N.J.</u>, 134 F.3d 113 (3d Cir. 1998) noted, "under representation of

blacks might result from any number of factors," which is why the law places the initial burden on

the plaintiff to show that the specific factor challenged under the disparate impact model results in

the discriminatory impact.  <u>Id.</u> at 115, 121-22 (holding plaintiffs failed to show that residency

requirement for municipal employees, independent of other factors that may affect the racial balance

of the workforce, was causally related to racial disparity).  Here, like in <u>City of Bayonne</u>, Plaintiff's

proffered evidence is far too incomplete and insubstantial to raise such an inference of causation and

therefore cannot defeat summary judgment.  <u>See also</u> <u>Spence v. City of Phila.</u>, 2004 WL 1576631, at

*8 (E.D. Pa. July 1, 2004) (mere proffer of statistics showing racial disparity in supervisory

positions did not satisfy plaintiff's burden to establish a prima facie case under the disparate impact

analysis, because plaintiff cannot show a causal connection).

   Moreover, even if causation were established, the automatic disqualification factors almost

certainly are justified by business necessity.  On this point, <u>Clinkscale v. City of Phila.</u>, No. 97-

2165, 1998 WL 372138 (E.D. Pa. June 16, 1998) is instructive.  In that case, discussed at length at

oral argument, the plaintiff waged a Title VII claim challenging the Philadelphia Police

Department's policy of excluding applicants on the basis of previous arrests without convictions.

Like Foxworth, Clinksdale contended that the policy had a disparate impact on African American

applicants, who were more likely than whites to be arrested.  <u>Id.</u> at *1.  However, the court held the

---

personnel (which the report does not specify), it certainly would seem to also include *all
troopers*, not just cadets in training.

policy was justified by business necessity and therefore granted summary judgment in favor of the defendant.  Id. at *2.  In so doing, the court found that "to give someone a badge, a gun, and-practically speaking-almost unlimited authority over his or her fellow citizens is a grave responsibility [and] in light of the serious public safety concerns at issue . . . as a matter of law, defendants' policy serves substantial and legitimate interests."  Id.  As applied to this case, the reasoning in Clinksdale is persuasive.  As in that case, the automatic disqualifications factors here serve important purposes: ensuring both public safety and that police officers do not disregard, nor are perceived as disregarding, the law.  Accordingly, we find that the PSP's policy is justified by business necessity.  See also El v. Southeastern Pa. Transp. Auth., 2005 WL 1655880, at *9 (E.D. Pa. July 12, 2005) (SEPTA's policy of excluding persons from employment based upon their conviction records justified by business necessity).

### 2.   Burdens Two and Three: Proffered Reason and Pretext

Assuming that Foxworth establishes a *prima facie* case, the defendant employer must next clearly set forth a legitimate nondiscriminatory reason for its action.  See Fuentes, 32 F.3d at 763. Defendants contend that notwithstanding Plaintiff's allegations, Plaintiff was disqualified solely because he admitted to felony-level behavior: stealing $4,000 from a former employer. (Def.'s Mot. Summ. J. at 7).  On its face, the policy to reject all applicants who had committed certain criminal behavior is a legitimate, nondiscriminatory reason for Foxworth's rejection.  See Fuentes, 32 F.3d at 763.  Therefore, Defendants have satisfied their burden.

Accordingly, our analysis must turn to the third and final aspect of the inquiry.  That is, Plaintiff can only survive summary judgment if there "is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a

pretext for intentional race discrimination." <u>Jones v. School Dist. of Phila.</u>, 198 F.3d 403, 412 (3d

Cir. 1999); <u>See also</u> <u>Sheridan</u>, 100 F.3d at 1066.   The Third Circuit has explained that this final,

third prong is in fact comprised of two alternatives.   Namely, Plaintiff can discredit a legitimate

reason proffered by the "by pointing to some evidence, direct or circumstantial, from which a

factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or

(2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action." <u>Jones</u>, 198 F.3d at 413 (citing <u>Fuentes</u>, 32 F.3d at

764 and <u>Sheridan</u>, 100 F.3d at 1067).   In order to prevail on the first alternative, plaintiff must

"demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons for its actions that a reasonable factfinder could

rationally find them unworthy of credence." <u>Id.</u>   If he pursues the second alternate, a plaintiff must

point to evidence in the record which allows the fact finder to infer that discrimination - e.g.

evidence that defendant "previously discriminated against [plaintiff], that the employer has

previously discriminated against other persons within the plaintiff's protected class, *or that the*

*employer has treated more favorably similarly situated persons not within the protected class*." <u>Id.</u>

(citing <u>Fuentes</u>, 32 F.3d at 765) (emphasis added).

Defendants argue that no fact-finder could find their reason pretextual.   They offer evidence

that the majority of applicants that have been disqualified for the same reason as Plaintiff were

white.  (Def.'s Mot. Summ. J. at 10.).   Plaintiff seemingly focuses on the second <u>Jones</u> alternative,

repetitively arguing that pretext could be inferred from the PSP's more favorable treatment of

Michael Evans.  (Pl.'s Resp. to Summ. J. at 14-26).   Plaintiff argues that he and Evans are similarly

situated because they were both cadet applicants subject to a background investigation and

19

disqualification procedures, albeit not automatic disqualifiers when Evans was hired.  Id. at 16-17.

Plaintiff also states that pretext is demonstrated in this case because the impact of applying the

factors is to disqualify a disproportionate percentage of minority applicants.  Id. at 7, 12.  Plaintiff

further argues that Defendants' data regarding the disqualified applicants in 2003 is "veiled and

reaching," as no other cadet applicant had an ARD.

Despite Plaintiff's protestations, he simply does not raise a sufficient inference of pretext.

Defendants offer evidence that they have an official, written policy that cadet applicants are subject

to disqualification if they engaged in "criminal behavior, *regardless if arrested*, for admissions by

the applicant that would be graded as a Misdemeanor-1 or higher." (Def's Ex. E/Polek 5 -

Automatic Disqualification Factors).   Plaintiff candidly admitted to the Boston Market theft, which

was criminal behavior that would be graded at least as a Misdemeanor-1, and was thus asked to

withdraw (or be subject to disqualification).   Plaintiff's argument that no cadet applicant other than

him had an ARD is simply irrelevant to the key question relevant to pretext: whether the PSP's

articulated legitimate reason for disqualifying Plaintiff is *believable*.   In contrast, the fact that

Plaintiff was asked to withdraw almost *immediately* after submitting his application packet and

completed "Polygraph Screening Booklet," in which he included information about the Boston

Market theft, strongly supports the PSP's contention that the criminal behavior was the true reason

for rejecting Plaintiff.  Moreover, this policy has been in place since 1997, and has been applied to

numerous white cadet applicants.  Defendants submitted evidence that in 2003, of forty-three cadet

applicants that were disqualified or withdrew their applications because of criminal behavior (not

including Plaintiff), forty-one were white. (Def's Ex. E/Polek 12 - Disqualification documentation

for 2003 applicants).  Plaintiff offers no evidence in rebuttal.  In fact, when probed at oral argument,

Plaintiff essentially admitted he had no evidence that Defendants intentionally discriminated against him.  Instead, Plaintiff's repeated allegations of discrimination are nothing more than subjective beliefs that he was wronged because of his race.

Foxworth's reliance on the fact that the "similarly situated" Michael Evans was hired in 1995 despite a questionable background is misplaced.  First, there is ample evidence that Mr. Evans is not similarly situated.  Evans was hired in 1995, eight years before Plaintiff applied.  Also, the PSP did not have automatic disqualification procedures in place at that time, a fact conceded by Plaintiff. (Pl.'s Resp. to Summ. J. at 16).  Evans is remote in time and fact and, simply stated, is not a comparator.

Second, even if he were, Plaintiff cannot pick and choose one particular comparator while ignoring others.  In Simpson, a demoted jewelry store employee brought suit against her employer under the Age Discrimination in Employment Act ("AEDA").[13]  Like Foxworth, she pointed solely to a "similarly situated" younger manager who was not demoted or fired to show pretext, while ignoring thirty-five other younger managers who *were* demoted because of poor performance. Affirming the district court's grant of summary judgment in favor of the defendant, the Third Circuit clearly held that pointing to the younger manager failed to establish pretext, as plaintiff "can not pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than [plaintiff]." Simpson, 142 F.3d at 645-47.   See also Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th Cir. 1993) (holding that a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when some other

---

[13]The AEDA is analyzed under the same McDonell Douglas burden-shifting analysis as Title VII claims.  Simpson, 143 F.3d at 643.

white persons were treated less favorably).

Simpson is dispositive here.  Mr. Foxworth, like Simpson, tries to rely solely on one individual who was allegedly treated more favorably, while ignoring the forty-one white cadet applicants who in 2003 were rejected for the exact same reason as Plaintiff: for admitting criminal behavior.  Despite Plaintiff's twelve pages of protestations to the contrary, Simpson makes clear that he "cannot pick out one comparator who was not [rejected] amid a sea of persons treated the same as [him] to establish a jury question." Simpson, 142 F.3d at 646.

In sum, Plaintiff offers nothing that could be construed as creating a triable issue of fact as to the issue of pretext.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's employment race discrimination and equal protection claims, asserted pursuant to Title VII, § 1981 and § 1983.

**B.     Due Process**

**1.     Substantive Due Process**

To prevail on a non-legislative substantive due process claim, a plaintiff must, as a threshold matter, establish that he or she was deprived of a right or interest that is "fundamental" under the United States Constitution. Nicholas v. Pa. State Univ., 227 F.3d 133, 140 (3d Cir. 2000).   The Third Circuit has indicated general reluctance to apply substantive due process theory in cases where other constitutional claims are extant, Khodara Envt'l. Inc. v. Beckman, 237 F.3d 186, 197-98 (3d Cir. 2001), or when property rights other than real property ownership are advanced by a plaintiff, Nicholas, 227 F.3d at 141.  Specifically, the Third Circuit has squarely held that tenured public employment is not a fundamental interest under the Constitution and thus a terminated public employee cannot invoke substantive due process principles to challenge that action. Nicholas, 227

F.3d at 138-43. See also McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir. 1994) (en banc)

(employment rights are not fundamental and do not enjoy substantive due process protection);

Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1142 n.10 (4th Cir. 1990) (right of

professor to a position at university is a state law contract right, not a fundamental right found in

Constitution).  In Nicholas, a tenured public university professor was fired because he repeatedly

refused to assure his supervisor that he would work full-time hours at his lab. Nicholas, 227 F.3d at

136-137.  The court held that, unlike real property ownership, public employment is not an interest

worthy of substantive due process. Id. at 141.  Moreover, in Williams v. LaCrosse, No. 03-6724,

2005 WL 927112 (E.D. Pa. Apr. 20, 2005), this court concluded that, as a matter of state law,

plaintiff did not have a protected property interest in his continued employment as a *probationary*

*trooper* with the Pennsylvania State Police, and thus his substantive due process claim could not

stand.  Id. at *6.

Further, even when a fundamental interest is demonstrated, "the substantive component of

the Due Process Clause is violated by executive action only when it can properly be characterized as

arbitrary, or conscience shocking, in a constitutional sense." County of Sacramento v. Lewis, 523

U.S. 833, 847 (1998); United Artists Theater Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392,

401-402 (3d Cir. 2003); Miller v. City of Phila., 174 F.3d 368, 375 (3d Cir. 1999).  However,

whether an official's conduct "shocks the conscience" must be analyzed along a "culpability

spectrum;" behavior "that shocks in one environment may not be so patently egregious in another."

Lewis, 523 U.S. at 849; Miller, 174 F.3d at 375.  At one end, "when a government official is acting

instantaneously and making pressured decisions without the ability to fully consider their risks," his

actions will be held shocking to the conscience only when a "purpose to cause harm" is

23

demonstrated.  Lewis, 523 U.S. at 854 (involving a high speed police chase).  At the other end,

when actual deliberation is "practical," conduct that is merely "deliberately indifferent" will shock

the conscience.  Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000) (en banc) (caseworker with "time

to make unhurried judgments" placed child in a foster family where abuse occurred).  When the

circumstances lie between the parameters of deliberate and spontaneous — an intermediate setting

— plaintiff must show at least "gross negligence or arbitrariness" to satisfy the shock the conscience

standard.  Miller, 174 F.3d at 375-376 (social worker petitioned for an emergency hearing to approve

the removal of children from their mother for suspected abuse).

 Defendants contend that because the Third Circuit has clearly held that a *tenured* public

employee has no fundamental right in his or her employment, Plaintiff cannot even establish that he

has a fundamental interest that is protected by substantive due process.  Moreover, Defendants argue

that even if Plaintiff could assert the deprivation of a fundamental right, Plaintiff can not satisfy the

test that the Defendants' conduct was shocking to the conscience. (Def.'s Mot. Summ. J. at 12-13).

Plaintiff appears to concede he has no fundamental right to employment, and then seemingly

(although not completely clearly) asserts the PSP's disqualification of Plaintiff amounts to

"invidious discrimination" that would not even pass rational basis review.  Further, he argues that

because the PSP had time to make an unhurried judgment, the intermediate "gross negligence or

arbitrariness" analysis applies.  Under that standard, Plaintiff argues Defendants actions in: (1)

applying the disqualification factors to an applicant with ARD, (2) maintaining detailed information

on Plaintiff's expunged charge, and (3) hiring Michael Evans in 1995 were all shocking to the

conscience.  (Pl.'s Resp. to Summ. J. at 40-43).

 Because the Third Circuit has clearly held that a *tenured* public employee has no

fundamental right in his or her employment, certainly Plaintiff, merely an *applicant*, has no cognizable interest.   The Court therefore agrees with Defendants that public employment is not a fundamental interest under the Constitution and thus does not enjoy substantive due process protection.  Plaintiff actually concedes this point, and has failed to point to another, protected property interest that would provide a basis for his substantive due process claim.

        Even were this court to find a fundamental right were at issue, Plaintiff still could not show that the Defendants' actions were conscience shocking, in a constitutional sense.  First, the Court agrees with Plaintiff that the PSP's actions should be judged at a lower point along the "shock the conscience" spectrum.  In both devising and applying the automatic disqualification factors, the PSP obviously was under no time pressure nor were exigent circumstances present.  Unlike the car chase in <u>Lewis</u> or emergency removal of children in <u>Miller</u>, they had the time to proceed in a deliberate fashion.  As the circumstances afforded the Defendant PSP the unfettered luxury of making a completely unhurried judgment, the "deliberate indifference" version of the "shocks the conscience" rule is the proper standard to apply.

        However, even applying the "deliberate indifference" criterion, we cannot agree with Plaintiff that the PSP's conduct meets that standard.   The PSP devised and implemented the automatic disqualification factors as part of an attempt to remedy past discrimination pursuant to the <u>Bolden</u> consent decree, and their cadet hiring criteria was specifically accepted by this district court. <u>See</u> <u>Bolden</u>, 1999 WL 80289 at *2.  Moreover, those disqualification factors have been used to reject applicants of all races and without regard to whether the applicant had been arrested, charged or even had his conviction expunged pursuant to ARD.  Moreover, the PSP is charged with hiring responsible officers to help enforce the laws of the Commonwealth and therefore has a strong

interest in weeding out applicants whose past suggests questionable character.  Given these facts,

Plaintiff has completely failed to establish that, in automatically disqualifying the Plaintiff for

criminal behavior, the PSP or any of its officers were in any way deliberately indifferent to his

rights.   Moreover, Plaintiff's additional contention that the PSP's "improper" retention of more

than just his name and date of arrest[14] after expungement also could be found to shock the

conscience it also meritless. 18 Pa. Cons. Stat. § 9122(c) specifically confers on the PSP the duty to

"maintain a list of the names and other criminal history record information" to be used for the

purpose of determining subsequent eligibility for ARD.  It does not indicate what information is

appropriate to retain for this purpose.  Even taking as true Plaintiff's allegation that there "was no

reason to retain . . . information [other than his name and arrest]," keeping extra information at most

rises to the level of negligence.  The Supervisor of the Investigative Records Unit Roy Van Buskirk

indicated that as a regular bookkeeping function, the PSP keeps a record of *every order* they receive

but do not publicly disseminate any of the information contained therein.  Such routine procedures,

undertaken with a belief that the PSP is in compliance with 18 Pa. Cons. Stat. § 9122 simply does

not evince deliberate indifference to Plaintiff's rights. (Pl's Ex. 3 - Van Buskirk Dep. at 56-57,

62).[15]

There is no fundamental Constitutional right to public employment, so the Plaintiff's claim

---

[14]Plaintiff avers that the Expungement Log Sheets included certain information that should not be kept after expungement, including an indication that Plaintiff was charged with robbery (because the district attorney did not proceed with robbery charges against the Plaintiff), the docket number, and agencies involved (Cheltenham Police Department and Montgomery County District Attorney). (Pl.'s Resp. to Summ. J. at ¶26).

[15]In addition, the court rejects summarily Plaintiff's argument that hiring cadet Evans in 1995 is shocking to the conscience.  The PSP's actions with respect to another cadet is completely irrelevant to whether the PSP denied *Plaintiff* of substantive due process.

fails from the start.  However, even assuming Plaintiff could establish a fundamental right, the Defendants' actions do not shock the conscience.  For these reasons, Plaintiff's substantive due process claim fails as a matter of law.

### 2.    Procedural Due Process

The requirements of procedural due process apply only where a plaintiff has suffered a state-sponsored deprivation of life, liberty, or property. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569-70 (1972).   Before an individual may be deprived of a protected interest, he must generally be afforded the opportunity for a hearing. Id. at 570, n.7.  Here, Plaintiff states he was deprived of both liberty and property when he was told to withdraw without any hearing to contest the disqualification process.

### a.    Liberty Interest

In Paul v. Davis, 424 U.S. 693 (1976), the Supreme Court made clear that in order to set forth a claim for a violation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus some concomitant infringement of a right or interest.  Id. at 701, 709.  Known as the "stigma plus" test, a plaintiff alleging damage to his employment reputation must demonstrate (1) an injury to reputation ("stigma") that is (2) linked to a tangible employment action, such as suspension from or termination of an existing job, or the imposition of a legal or administrative disability ("plus"). Id. at 712; Graham v. City of Phila., 402 F.3d 139, 142 n.2 (3d Cir. 2005); Ersek v. Twp. of Springfield, 102 F.3d 79, 83 n.5 (3d Cir. 1996).

Defendants argue that stigma cannot be shown because PSP did not publicly disseminate any information, much less false information about Plaintiff.  Further, they contend Plaintiff fails the "plus" part of the test because as a mere applicant, Plaintiff had no right or status previously

recognized by state law which was extinguished.  (Def.'s Mot. Summ. J. at 14-15).  Plaintiff

counters that under the broad protections of procedural due process, he need only state damage to

his reputation; he argues he was in fact stigmatized in that he suffered humiliation and diminished

job prospects. (Pl.'s Resp. to Summ. J. at 38-39).

   As a threshold matter, Plaintiff is incorrect that he need not satisfy both prongs of the

stigma-plus test.  <u>Paul</u> made clear that mere damage to reputation is *not* sufficient absent some

concomitant loss of a tangible interest.  Thus, we must proceed to analyze both the "stigma" and the

"plus" prongs.

   The Third Circuit has noted on more than one occasion that "it is not clear whether

something less than a property interest, independently protected by the Due Process Clause" could

satisfy the "plus" prong of <u>Davis</u>.  <u>See</u> <u>Ersek</u>, 102 F.3d at 83 n.5 (stating that "what satisfies the

'plus' [prong] . . . is uncertain.").  <u>See also</u> <u>Graham</u>, 402 F.3d at 142 n.2.  Therefore, in both <u>Graham</u>

and <u>Ezrek</u>, the Third Circuit assumed without deciding that loss of at-will employment satisfies, or

might satisfy, the "plus" requirement, even though it is not a constitutionally-protected property

interest. <u>Graham</u>, 402 F.3d at 142 n.2 (probationary police officer terminated because of arrest);

<u>Ersek</u>, 102 F.3d at 83 n.5 (golf professional at municipal golf course not re-hired after expiration of

contract after investigation into possible wrongdoing).  However, in both cases, the court explicitly

noted that it "ha[s] not yet decided this issue."  <u>Graham</u>, 402 F.3d at 142 n.2.

   Unlike the plaintiffs in <u>Graham</u> and <u>Ezrek</u>, Plaintiff in the present case was not an employee

at all; he was merely an applicant with an conditional offer of employment.  Plaintiff was instructed

that he still had to meet a number of additional requirements before he was to become even a

probationary employee.   Therefore, we are inclined to believe that disqualification (or withdrawal

28

under the threat of disqualification) does not implicate the due process clause's protection of a property interest at all.  See, e.g. Altieri v. Pa. State Police, No. 98-5495, 2000 WL 427272, at *11 (E.D. Pa. Apr. 19, 2000) (rejecting PSP trooper applicant's liberty interest claim).  However, since the Third Circuit has not yet squarely confronted this issue, we too are willing to assume *arguendo* that Plaintiff's withdrawal under threat of automatic disqualification satisfies the "plus" requirement.

However, for government action to satisfy the "stigma" requirement, it must "involve a publication that is substantially and materially false."  Ersek, 102 F.3d at 83-84.  See also Burkhart v. Randles, 764 F.2d 1196, 1201 (6th Cir. 1985) (stigma must involve voluntary, public dissemination of false information in the course of decision to terminate employment).  Further, the alleged false charges must rise to the level that they "might seriously damage his standing and associations in his community" or that impose a "stigma or other disability that forecloses freedom to take advantage of other employment opportunities." Wells v. Hico Independent School Dist., 736 F.2d 243, 256 (5th Cir. 1984) (internal citations omitted).  See also Doe v. Casey, 796 F.2d 1508, 1523 (D.C. Cir.1986) (plaintiff must allege defendant altered the status of the employee in some tangible way and that the disclosure of information foreclosed the employee's future employment opportunities).

It is under this prong that Plaintiff's procedural due process claim fails.  First, Plaintiff has offered no evidence that Defendants publicly disclosed any information about him.  In fact, the uncontested facts reveal that when the individual Defendants discussed the matter with him, they did so away from the other candidates to afford him greater privacy.  Second, the entire basis of Plaintiff's rejection — the facts underlying the Boston Market theft — are entirely *true*.  In fact,

Plaintiff repeatedly reminds this court that he fully admitted to committing the crime. Thus, he fails whole-scale in demonstrating the PSP published "substantially and materially false" information. Finally, there is nothing to indicate that Defendants actions will "foreclose [Plaintiff's] freedom to take advantage of other employment opportunities." In fact, Defendant McElheny allowed Plaintiff to withdraw his application rather than be disqualified specifically so that other prospective employers would *not* find out. Further, Defendants' actions in no way change the fact that the Boston Market incident has been expunged, and Plaintiff may without fear pursue any job that requires a clean criminal history record. Even construing the facts in the light most favorable to Plaintiff, he has failed to set forth a triable issue of fact related to any liberty interest in his employment reputation.

### b.        Property Interest

To establish a property interest that affords procedural due process protection, a plaintiff must demonstrate that he or she has a "legitimate claim of entitlement" to the asserted right. Roth, 408 U.S. at 577. Whether such a claim of entitlement exists is not determined by the Constitution, but rather according to existing state law. Id.; Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005).

It is well established that public employees in Pennsylvania generally are employees at will who have no protected property interest in their employment unless the legislature explicitly confers tenure as an integral part of a comprehensive governmental employment scheme. Cleary, 399 F.3d 282; Davenport v. Reed, 785 A.2d 1058, 1063 (Pa. Cmwlth. 2001) (citing Stumpp v. Stroudsburg Mun. Auth., 658 A.2d 333, 335 (Pa. 1995)). With respect to police officers in particular, under Pennsylvania law, probationary police troopers and applicants have no property interest in their positions. Blanding v. Pa. State Police, 12 F.3d 1303, 1307 (3d Cir. 1993) (probationary state police

trooper); Anderson v. City of Phila., 845 F.2d 1216, 1221 (3d Cir. 1988) (city police applicant).[16]

Under this unambiguous and uniform precedent, Plaintiff, a cadet applicant, clearly has no protected

property interest in any anticipated employment with the PSP.

Plaintiff, while acknowledging this general rule, maintained at oral argument and in his

briefs that an independent state law may create a protected property interest.  He therefore urged that

18  Pa. Cons. Stat. § 9124, which prohibits governmental agencies' use "in consideration of an

application for a license, certificate, registration or permit"[17] of "[c]onvictions which have been

annulled or expunged," conferred a property right and a legitimate expectation that his records

would not be divulged.  Citing Brickhouse v. Spring-Ford Area Sch. Dist., 656 A.2d 483 (Pa. 1995),

for the proposition that a hiring policy may not frustrate such a state statute, Plaintiff maintained that

the PSP's policy of asking about expunged convictions and using this information to disqualify

candidates is a procedural due process violation.  (Pltf.'s Memo. at 13-14, 27-29).  The Defendants

counter that based on its plain language, section 9124(b) does not apply to applicants going through

the State Police cadet selection process, because PSP applicants are not seeking "licenses,"

"certificates," "registration,"or "permits."   Moreover, they maintain that Plaintiff was asked to

withdraw not because of his status as an ARD offender, but because of the *behavior* underlying it.

(Def.'s Mot. Summ. J. at 19-20). Finally, Defendants noted at oral argument that because an ARD

disposition is not the same as an acquittal, program participants cannot expect ARD disposition to

---

[16]See also Altieri, 2000 WL 427272, at *10 (state police applicant); Snisky v. Pa. State
Police, 799 A.2d 961, 964 (Pa. Cmwlth.2002) (state police candidate); Graham v. Pa. State
Police, 634 A.2d 849, 851 (Pa. Cmwlth. 1993) (probationary state police trooper).

[17]Section 9124 affords protection, he contends, because cadets are certified upon
graduation, a point he says is corroborated by 71 P.S. § 1195, which confers on the
Commissioner the authority to issue certificates of qualification to graduates of police academy
course.

be burden-free.

The Court agrees with Defendants that section 9124 is inapposite. Although it is true that a state statute, in certain limited circumstances, may give rise to a protected property interest, section 9124 does not accomplish this for Plaintiff. First, while the Third Circuit has not decided the issue of whether section 9124 could in any circumstance give rise to a protected property interest, Pennsylvania caselaw interpreting that provision clarifies that it applies only to *licensing agencies.* That is, the statute sets the boundaries of use of criminal record information by those boards, commissions or departments of the Commonwealth which are specifically authorized to license the practice of professions or occupations. See, e.g., Schmidt v. Deutsch Larrimore Farnish & Anderson, 876 A.2d 1044, 1047 (Pa. Super. 2005) (noting that § 9124 sets standards for "use of criminal records by licensing agencies"); Gangewere v. Pa. State Architects Licensure Bd., 512 A.2d 1301, 1304-05 (Pa. Cmwlth. 1986) (§ 1924 is designed to allow "boards, commissions or departments of the Commonwealth which are *authorized to license the practice of professions or occupations* [to] suspend or revoke any license). For example, section 9124 is relevant to such occupations as architects and auctioneers, both of which require professional licensure and have a State Board that issues such licenses. See Pook v. Commonwealth, 735 A.2d 134, 139 (Pa. Cmwlth. 1999) (State Board of Auctioneer Examiners' denial of applicant's apprentice auctioneer license because he had been convicted for felony bid-pooling was specifically authorized under section 9124 of the CHRIA); Gangewere, 512 A.2d at 1304-05 (State Architects Licensure Board had authority, pursuant to § 9124, to suspend license for architect's federal convictions). In fact, the Pennsylvania Commonwealth Court has specifically held that section 9124 has no bearing on police agencies' consideration of their employees' or applicants' criminal histories because police officers

32

do not apply for a license.  See Poliskiewicz v. East Stroudsburg Univ., 536 A.2d 472, 474 (Pa.

Cmwlth. 1988) (holding § 9124 was irrelevant to case involving police officer who was terminated

because of criminal charges against him because officers would not apply for a license).

Here, Plaintiff was not applying for a license, certificate, registration or permit and thus we

fail to see how this section is relevant to his claimed property interest.  Even assuming graduating

cadets get some sort of certificate[18] this does not equate to the type of professional licensure or

certification that Pennsylvania courts have indicated that 18  Pa. Cons. Stat. § 9124 is meant to

cover.  Unlike the state boards responsible for issuing licenses to architects, auctioneers or attorneys,

there is no state board that issues police licenses.  Poliskiewicz., 536 A.2d at 474.  Furthermore,

conferring on persons who successfully complete the ARD program a property interest would create

an anomalous result.  In effect, this class of people would have a property interest in almost *any*

*public employment* to which they apply, while no other applicants —or even probationary

employees—would have such a right.  This would give Plaintiff, who committed a felony-level

theft, and others with expunged convictions more rights than persons who never engaged in criminal

behavior of any kind.  We cannot imagine this was the result intended by the legislature when they

---

[18]In his exhibits, Plaintiff included a "diploma" issued to cadets when they complete the
police academy.  (Pl's Ex. 27).  Linda Bonney also testified that she "think[s] [the graduating
cadets] get a certificate."  (Pl's Ex. 5 - Bonney Dep. at 50).  Further, Plaintiff cites 71 P.S. §
1195, which states that the PSP shall conduct "courses of instruction for the proper training of
persons to act as policemen for the several political subdivisions" and that the PSP
Commissioner is "authorized to establish standards of proficiency, training and discipline for
persons attending [the police academy], and to issue certificates of qualification to graduates of
the various courses of instruction." First, the plain language of this provision, discussing training
"for the several political subdivisions" suggests that it concerns training of *local* police officers,
not PSP cadets. Second, the statute does not state that the Commissioner must issue certificates,
but rather that he is merely authorized to do so.  Last, even if certificates or diplomas are
routinely issued to cadet graduates, this court remains unconvinced that this is the type of
professional certification that 18  Pa. Cons. Stat. § 9124 is meant to cover.

enacted CHRIA.[19]

Second, while ARD advances laudable goals, we agree with Defendants that program participants cannot legitimately expect that ARD will impose *no burdens whatsoever*. See Gilles, 427 F.3d at 211 (noting "the ARD program imposes several burdens upon the criminal defendant not consistent with innocence, including a probationary term, restitution . . . imposition of costs, and imposition of a reasonable charge relating to the expense of administering the program"). While Gilles did not address section 9124 directly,[20] this recent Third Circuit decision does lend credence to the idea that ARD participants can not legitimately expect that—i.e. do not have a property interest in—all information pertaining to ARD forever being kept secret. Moreover, Plaintiff was asked to withdraw not because of his status as an ARD offender or any information contained in his

---

[19]Additionally, Brickhouse, repeatedly cited by Plaintiff at oral argument for the proposition that an employment policy may not frustrate a state statute, is of no help to Foxworth. Brickhouse concerned a veteran who brought an action against a school district that did not hire him in alleged contravention of the Pennsylvania Veterans' Preference Act ("VPA"), and did *not* involve a due process challenge at all. Id. at 484-85. See also Basile v. Elizabethtown Area Sch. Dist., 61 F. Supp. 2d 392 (E.D. Pa. 1999) (also cited by Plaintiff addressing similar facts). Furthermore, the holding of Brickhouse is that a public employer may not formulate qualifications for a job is such a way as to *purposely defeat* the VPA, and if such formulations are undertaken in bad faith without regard to the legitimate need, they must fail. Brickhouse, 656 A.2d at 487. However, the Brickhouse court ultimately concluded that the plaintiff did *not* have to be hired for the position pursuant to the VPA because he failed to meet the school district's qualifications for the position, which were that the candidate have experience teaching social studies, high academic performance, outstanding recommendations and current references. Id. at 485, 488. Here, Plaintiff offers not a scintilla of evidence to substantiate a claim that the automatic disqualification factors were implemented to defeat section 9124. Instead, reminiscent of Brickhouse itself, "there is no doubt that the [PSP's] criteria for employment [requiring cadets to be law-abiding and not possess undesirable character traits was] rationally related to the job." Id. at 487. Like the Brickhouse plaintiff, Foxworth simply had not achieved the minimum qualifications for the job.

[20]The direct holding of Gilles with regard to ARD was that an ARD disposition is not a termination favorable for purposes of bringing a subsequent § 1983 malicious prosecution claim. Gilles, 427 F.3d at 211-212.

expungement order, but because of the *behavior* underlying it.  In this regard, it is significant that

Plaintiff himself *volunteered* the information regarding the Boston Market theft in both his

application and the polygraph screening booklet.  As such, the court concludes that, at least with

respect to an application for employment as a police cadet at the PSP, section 9124 does not give

rise to a property interest that confers procedural due process protection.[21]

Accordingly, the court grants Defendants' motion for summary judgment on Plaintiff's

substantive and procedural due process claims.

### 2.    Equal Protection

The Equal Protection Clause guarantees, in its concern for equality, that people who are

similarly situated will be treated similarly.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S.

432, 439 (1985).  The legal standard that will be applied to the equal protection claim of course

depends on whether Foxworth premises his claim based on a racial or another, non-suspect,

classification.  Where a plaintiff contends that he was treated differently in employment because of

his race, as discussed *supra*, the McDonnell Douglas-Burdine-Hicks burden-shifting framework

applies.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 n.1 (1993) (assuming applicability of

McDonnell Douglas framework to 42 U.S.C. § 1983); See also Stewart v. Rutgers, the State Univ.,

---

[21]At oral argument, the parties briefly addressed whether 18 Pa. C.S. § 9125 might
separately confer a protected property interest.  Section 9125, which addresses consideration of
criminal history with respect to applications for *all* employment, states that "felony and
misdemeanor convictions may be considered . . . only to the extent to which they relate to the
applicant's suitability for employment."  While it is true that under section 9125, employers may
consider only a prior conviction and not a prior arrest, Tilson v. School Dist. of Phila., Civ.A.
No. 89-1923, 1990 WL 98932, at *4 (E.D. Pa. July 13, 1990), aff'd, 932 F.2d 961 (3d Cir.1991),
the statute simply does not apply to the case at hand.  This is because the statute relates to
*criminal history record information*, which Foxworth does not have precisely because his record
was expunged. Thus, the PSP did not consider his record but instead relied on underlying
criminal behavior admitted by Plaintiff.  Accordingly, section 9125 does not confer a protected
property interest sufficient to support Plaintiff's due process claim.

120 F.3d 426, 432 (3d Cir. 1997).  However, to succeed on an equal protection claim based on a

non-suspect classification, Foxworth must show that the Defendants treated him differently from

others who were similarly situated, without a rational basis.  See, e.g., Cleburne, 473 U.S. at 440

(1985).  Under rational basis, the government's actions will be "presumed to be valid and will be

sustained if the classification drawn by the statute is rationally related to a legitimate state interest."

Id.

Noting that the basis of Plaintiff's equal protection claim is "difficult to discern,"

Defendants urge that if based on race discrimination, Plaintiff's claim would fail under the same

burden-shifting framework as was discussed earlier.  If based on a non-suspect classification,

Defendants argue that Plaintiff does not even allege, and cannot show, that he was treated

differently from any other *similarly situated* applicant.  Further, Defendants contend the PSP's

disqualification factors are not applied irrationally or in an arbitrary manner and serve substantial

and legitimate interests, including protecting public safety and workforce integrity.   (Def.'s Mot.

Summ. J. at 21-24).  Plaintiff responds by conceding that he must show Defendants treated him

differently.  However, he also asserts that he may satisfy his burden by demonstrating that the PSP

could have used alternate hiring practices that would have reduced the racially disparate impact.

(Pl.'s Resp. to Summ. J. at 42-45).

We agree with Defendants that the basis of Plaintiff's equal protection claim is difficult to

discern. Certainly, the majority of Plaintiff's complaint is based on alleged racial discrimination and

to the extent Plaintiff pursues his Equal Protection claim on that theory, our application above of the

McDonnell Douglas-Burdine-Hicks framework disposes of this claim.  However, we note that

Plaintiff's actual Equal Protection claim merely alleges that as a result of the automatic

36

disqualification procedures, Plaintiff was treated differently from similarly situated candidates with "lesser qualifications and/or tainted backgrounds." Id. at ¶61-62.  This classification based on background is not suspect; it would merely trigger rational basis review, which is easily satisfied by Defendants.  As discussed *supra*, the PSP's policy of excluding applicants on the basis of previous criminal behavior serves substantial and legitimate interests.  In sum, Plaintiff has failed to set forth a triable issue of fact.  Defendants are entitled to summary judgment on Plaintiff's equal protection claims.

**VI.    Conclusion**

_____Defendants are entitled to summary judgment on all Plaintiff's claims.[22]  An appropriate Order follows.

---

[22]Defendants additionally assert that Defendant Miller is entitled to summary judgment because liability can not be based on respondeat superior, and he had nothing to do with Plaintiff or with the events at issue.  Also, Defendants contend that qualified immunity shields the individual Defendants from actions for damages. (Def.'s Mot. Summ. J. at 24-27).  Because we determined *supra* that Defendants are entitled to summary judgment on all counts, we need not reach the issues of Defendant Miller's liability or qualified immunity.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


RODERICK FOXWORTH, JR.       :     CIVIL ACTION
                                   :
            v.                    :
                                   :
PENNSYLVANIA STATE POLICE, et al.   :     NO. 03-CV-6795


**ORDER**


      AND NOW this      day of November, 2005, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 48), and the responses thereto, it is hereby ORDERED that the Motion is GRANTED. Judgment is entered in favor of Defendants and against Plaintiff. Plaintiff's Motion to File a Surreply Brief (Doc. No. 61) is DENIED AS MOOT.  The Clerk shall close this case.


                             BY THE COURT:


                             **s\Michael M. Baylson**
                             _____
                             MICHAEL M. BAYLSON, U.S.D.J.


O:\CIVIL\03-6795, Foxworth v. PA State Police\03-6795, Foxworth v PA State Police M Summary Judgment, 11-29-2005.wpd